**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Parsons Xtreme Golf LLC,<br><br>Plaintiff,<br><br>v.<br><br>Taylor Made Golf Company Incorporated,<br><br>Defendant. | No. CV-17-03125-PHX-DWL<br><br>**ORDER** |
| Taylor Made Golf Company Incorporated,<br><br>Counter Claimant,<br><br>v.<br><br>Parsons Xtreme Golf LLC,<br><br>Counter Defendant. | |
| Parsons Xtreme Golf LLC,<br><br>Counter Claimant,<br><br>v.<br><br>Taylor Made Golf Company Incorporated,<br><br>Counter Defendant. | |

This matter was reassigned to the Court on October 31, 2018. (Doc. 171.) At the time, three matters were fully briefed and awaiting resolution: (1) Plaintiff Parsons Xtreme Golf LLC's ("PXG") motion for leave to amend its invalidity and infringement contentions

(Doc. 134), (2) Defendant Taylor Made Golf Company, Inc.'s ("Taylor Made") motion for leave to amend its invalidity contentions (Doc. 154), and (3) the parties' submission of joint proposed letters rogatory (Doc. 163). Additionally, two more motions have become fully briefed since the reassignment: (1) Taylor Made's motion to stay pending *inter partes* review (Doc. 164) and (2) PXG's motion to de-designate materials (Doc. 169). Finally, Taylor Made has also filed a motion to seal the exhibits to the de-designation motion (Doc. 176).[1]

As explained below, the Court will grant Taylor Made's motion to stay. A stay is appropriate because the Patent and Trademark Office has already agreed to conduct *inter partes* review ("IPR") of a substantial majority of the claims at issue, Taylor Made exhibited diligence (both in seeking IPR and in requesting a stay once the IPR process began), the case was in its early stages at the time the stay was requested, and the Court has not yet held *Markman* hearings or set a trial date. Issuing a stay is the norm, rather than the exception, under these circumstances. Additionally, the recent reassignment of this case undermines PXG's argument that a stay would squander the Court's institutional knowledge. It is also relevant that Congress's intent in creating the IPR system was to create an improved process for evaluating patent claims, by allowing subject matter experts to render binding decisions on a relatively expedited and cost-efficient basis. Issuing a stay here—rather than the alternative of requiring the parties to engage in costly, parallel litigation of overlapping issues in two different forums—will best effectuate Congress's intent. *See* Fed. R. Civ. P. 1 (the rules of civil procedure should be construed to promote the "just, speedy, and inexpensive determination of every action and proceeding").

Before entering the stay, however, the Court will grant PXG's motion to de-designate. The dispute concerns Taylor Made's effort to designate certain discovery

---

[1] On November 27, 2018, the Court held a telephonic status conference with the parties. During that conference, the parties addressed many of the matters addressed in this order, and the Court also sought supplemental briefing from PXG concerning the stay request. Accordingly, although the parties have requested oral argument on the pending motions, the Court will deny the requests—the issues have been fully briefed and further argument will not aid the Court's decision. *See* Fed. R. Civ. P. 78(b) (court may decide motions without oral hearings); LRCiv. 7.2(f) (same).

materials as "Confidential—For Counsel Only"—a designation that prevents four of PXG's key principals from reviewing these materials. PXG contends this designation is unjustified and prejudicial (because its principals need to review the documents to make informed decisions about settlement and litigation strategy). As explained below, the Court agrees that Taylor Made has failed to justify this heightened level of restriction and therefore orders Taylor Made to re-designate the materials as "Confidential," which will allow PXG's principals to review them.

Finally, because this matter will be stayed pending the outcome of the IPR process, the Court finds it unnecessary to resolve the parties' remaining pending motions. Specifically, there is no need to decide, at this juncture, whether the parties should be permitted to amend their invalidity and infringement contentions because the scope of this litigation is likely to be different once the IPR process is complete. For similar reasons, the Court declines, at this juncture, to issue the proposed letters rogatory. The issuance of those letters is likely to cause government officials (both here and in Japan) to expend substantial resources—an expenditure that may prove unnecessary depending on the outcome of the IPR proceedings.

A. <u>The Stay Request</u>

    **I.**    **Background**

        a.    *<u>Inter Partes</u> Review*

In 2011, Congress enacted the Leahy-Smith America Invents Act, which replaced the former *inter partes* reexamination proceeding with the IPR process. *See* 35 U.S.C. §§ 311-319; *see generally Oil States Energy Servs., LLC v. Greene's Energy Group, LLC*, 138 S. Ct. 1365, 1370-71 (2018); *Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2137 (2016). To institute IPR of a patent, a party other than the patent owner files a petition with the Patent and Trademark Office ("PTO"). *See* 35 U.S.C. § 311(a).[2] The petitioner "can request cancellation of '1 or more claims of a patent' on the grounds that the claim fails the novelty or nonobviousness standards for patentability. The challenges must be

---

[2] The Patent Trial and Appeal Board ("PTAB") conducts IPR proceedings. 35 U.S.C. § 316(c). In the context of IPR, courts often use PTO and PTAB interchangeably.

made 'only on the basis of prior art consisting of patents or printed publications.' If a petition is filed, the patent owner has the right to file a preliminary response explaining why inter partes review should not be instituted." *Oil States Energy Servs.*, 138 S. Ct. at 1371 (citations omitted).

Congress's intent in creating the IPR process was "'to establish a more efficient and streamlined patent system that will improve patent quality and limit unnecessary and counterproductive litigation costs' and 'to create a timely, cost-effective alternative to litigation.'" *PersonalWeb Techs., LLC v. Facebook, Inc.*, 2014 WL 116340, *2 (N.D. Cal. 2014) (quoting *Changes to Implement Inter Partes Review Proceedings, Post-Grant Review Proceedings, and Transitional Program for Covered Business Method Patents*, 77 Fed. Reg. 48,680 (Aug. 14, 2012), codified at 37 C.F.R. §§ 42.100 *et seq.*). As the Supreme Court has explained, "the purpose of the [IPR] proceeding is not quite the same as the purpose of district court litigation. . . . [I]n addition to helping resolve concrete patent-related disputes among parties, *inter partes* review helps protect the public's 'paramount interest in seeing that patent monopolies . . . are kept within their legitimate scope.'" *Cuozzo Speed Techs.*, 136 S. Ct. at 2144 (citation omitted).

The IPR process "affords at least three advantages to the parties and the district court in any corollary civil action." *PersonalWeb Techs.*, 2014 WL 116340 at *2. The first advantage is that "IPR provides a path to receive expert guidance from the PTO under a more accelerated timeline than the previous . . . procedure: petitioners must file for IPR within one year of being served with a patent infringement complaint and IPR, if instituted, will typically conclude within 18 months of the filing date. In contrast, the average time from filing to conclusion of the previous . . . procedure ranged from 28.9 to 41.7 months." *Id.* (citations omitted); *see also Wonderland Nursery Goods Co. v. Baby Trend, Inc.*, 2015 WL 1809309, *1-2 (C.D. Cal. 2015) (noting that the IPR "procedure is designed . . . to reduce to 12 months the time the PTO spends reviewing validity, from the previous reexamination average of 36 months"). The second advantage arises from IPR's heightened standard for granting review. IPR is available only if the PTO finds "there is a

*reasonable likelihood* that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition." 35 U.S.C. § 314(a) (emphasis added). In contrast, under the previous system, a petitioner merely needed to demonstrate a "substantial new question of patentability." The upshot of this new, heightened standard is that the decision to institute IPR reflects an implicit judgment by the PTO that at least one of the subject claims is likely to be modified or cancelled. This "provides some assurance that the delay suffered as a result of IPR will be worthwhile." *PersonalWeb Techs.*, 2014 WL 116340 at *2; *see also Wonderland Nursery*, 2015 WL 1809309 at *1 (citation omitted) (the new "standard for granting review is more stringent than the previous 'substantial new question of patentability' standard"). The third advantage is that "IPR imposes an estoppel requirement that precludes the petitioner from asserting invalidity, during a later civil action, 'on any ground that the petitioner raised or reasonably could have raised during that *inter partes* review.' This critical limitation results in a more streamlined litigation and reduces the likelihood of inconsistent judgments." *PersonalWeb Techs.*, 2014 WL 116340 at *2 (quoting 35 U.S.C. § 315(e)(2)).

      b. <u>Relevant Facts Concerning the Stay Request</u>

On September 12, 2017, PXG filed a complaint alleging that Taylor Made's P790 golf irons infringe eight patents held by PXG (Nos. 8,961,336; 9,199,143; 9,345,938; 9,346,203; 9,364,727; 9,533,201; 9,610,481; and 9,675,853). (Doc. 1.) Simultaneously, PXG moved for a temporary restraining order ("TRO"). (Doc. 5.) The court denied the TRO request on September 15, 2017. (Doc. 21.) On September 28, 2017, PXG withdrew its motion for a preliminary injunction. (Doc. 30.)

On December 4, 2017, PXG amended its complaint to add three more patents (Nos. 9,764,208; 9,468,821; and 9,814,952). (Doc. 47.) PXG again amended its complaint on February 2, 2018, adding U.S. Patent No. 9,878,220 and withdrawing the '208 patent, leaving eleven patents at issue. (Doc. 76.) On February 9, 2018, PXG served Taylor Made with infringement contentions identifying a total of 93 asserted claims. (Doc. 83; *see* Doc. 164 at 3.)

Taylor Made petitioned for IPR on two of PXG's patents in February 2018, three in March 2018, four in April 2018 (one of these patents was also included in a September 2018 petition), one in August 2018, and one in October 2018. When Taylor Made filed its stay request, the PTO had instituted IPR on five patents, and by the time Taylor Made filed its reply, the PTO had instituted IPR on another four patents. At present, the instituted IPR proceedings cover 69 of PXG's 93 asserted claims. Additionally, Taylor Made contends that it expects the PTO to decide whether to institute IPR on the remaining two patents by early May 2019. (Doc. 177 at 1.)

At the time the stay request was filed, discovery was underway but in its early stages—only one fact deposition had been taken, only some expert discovery had taken place, and only a portion of documents had been produced. The parties had completed *Markman* briefing, but the *Markman* hearing had not been scheduled. The parties had not begun summary judgment briefing, and a trial date had not been set. The parties agreed to extend this briefing schedule on the stay request, and by the time PXG filed its response, more documents had been produced and four more fact witness depositions had been taken.

**II.  Legal Standard**

"A court's power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants. In deciding how best to exercise this inherent power, the court must weigh competing interests and maintain an even balance." *Drink Tanks Corp. v. GrowlerWerks, Inc.*, 2016 WL 3844209, *2 (D. Or. 2016) (citation and internal quotation marks omitted).

"With regard to deciding whether to stay litigation pending IPR, courts generally consider the following three factors: (1) whether discovery is complete and whether a trial date has been set; (2) whether a stay will simplify the issues in question and trial of the case; and (3) whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party." *Id.* (citation omitted). Although courts generally "apply a liberal policy in favor of granting motions to stay proceedings pending the outcome of PTO IPR

proceedings . . . the totality of the circumstances governs . . . and a stay is never required." *Id.* (citations and internal quotation marks omitted); *cf. Medicis Pharmaceutical Corp. v. Upsher-Smith Laboratories, Inc.*, 486 F. Supp. 2d 990, 993 (D. Ariz. 2007) (citations omitted) ("Indeed, district courts within this Circuit have noted that 'there is a liberal policy in favor of granting motions to stay proceedings pending the outcome of USPTO reexamination . . . proceedings.'").

**III. Analysis**

a. <u>Stage of Litigation</u>

The Court considers first "whether discovery is complete and whether a trial date has been set." *Drink Tanks*, 2016 WL 3844209 at *2. Taylor Made argues this factor supports granting a stay because: (1) discovery is not yet complete; (2) the *Markman* hearing has not yet been scheduled, so no disputed claim terms have been construed by the Court; (3) no summary judgment motions or *Daubert* motions have been filed; and (4) no trial date has been set. (Doc. 164 at 8-9.) In response, PXG contends that: (1) discovery is far advanced, as the parties have produced tens of thousands of documents, taken eight depositions, and issued at least twelve third-party subpoenas; (2) the parties have exchanged detailed infringement and invalidity contentions and completed their *Markman* briefing for dozens of claim terms; (3) pre-trial disclosures and dispositive motions are due within the next year; and (4) the Court has invested its resources into the case in resolving various questions to date. (Doc. 172 at 5-8.)

Although the parties both present colorable arguments in favor of their respective positions, the Court finds this factor weighs in favor of granting the stay. "Generally, the time of the motion is the relevant time to measure the stage of litigation." *VirtualAgility Inc. v. Salesforce.com, Inc.*, 759 F.3d 1307, 1317 (Fed. Cir. 2014). Here, at the time Taylor Made filed its motion, only one fact deposition had been taken, little expert discovery had taken place, the *Markman* hearing had not been scheduled, no dispositive motions had been filed, and a trial date had not been set. Courts have found that a stay is generally warranted under such circumstances. *See, e.g., Wonderland Nursery*, 2015 WL 1809309 at *3 (first

factor weighed in favor of stay where "fact discovery [was] not yet complete, expert discovery ha[d] not yet begun, and a trial date ha[d] not yet been set," and "although the parties ha[d] submitted claim construction briefs, the *Markman* hearing ha[d] not yet taken place and no disputed claim terms ha[d] been construed by th[e] Court"); *PersonalWeb Techns.*, 2014 WL 116340 at *3-4 (first factor weighed in favor of stay where "the parties ha[d] yet to engage in the significant and costly work of conducting expert discovery and preparing summary judgment motions," even though "[t]he parties and courts ha[d] already invested significant time and effort into [the case]"). Although the parties have completed *Markman* briefing, "[t]hat fact . . . has only minimal impact on this analysis," as "the possibility of cancellation or modification may require modified or new briefing." *Convergence Techs. (USA), LLC v. Microloops Corp.*, 2012 WL 1232187, *4 (N.D. Cal. 2012). In short, the parties and the Court have substantial work remaining to be done. *See id.* (finding that, where discovery was not complete, and the court had not yet heard claim construction or set a trial date, the "case ha[d] not reached the 'point of no return' for which a stay would [be] inappropriate").

It is also relevant that this case was reassigned only a few weeks ago, right as PXG was preparing its opposition to the stay request. The reassignment undermines PXG's arguments that "if a stay is imposed . . . the Court's institutional knowledge of this case will stagnate" and that "the Court has invested its own resources into this case—starting from the September TRO proceedings—so staying this litigation now will likely result in needless duplication of efforts later." (Doc. 172 at 3, 8.)

The Court also finds it relevant that PXG requested an extension of the briefing schedule on the stay request, and then, during the extended period to file its brief, produced the majority of its documents and scheduled several depositions. A stay request should be evaluated based on the state of play at the time the request was filed. Discovery was, thus, not as far advanced as PXG contends.

On balance, the first factor weighs in favor of granting a stay.

b. Simplification of Issues in Question

The Court next considers "whether a stay will simplify the issues in question and trial of the case." *Drink Tanks*, 2016 WL 3844209 at *2. This factor cuts strongly in favor of a stay. Indeed, staying the case pending the outcome of IPR proceedings "could eliminate the need for trial if the claims are cancelled or, if the claims survive, facilitate trial by providing the court with expert opinion of the PTO and clarifying the scope of the claims." *Advanced Micro Devices, Inc. v. LG Elecs., Inc.*, 2015 WL 545534, *3 (N.D. Cal. 2015) (citation omitted); *see also Evolutionary Intelligence LLC v. Yelp Inc.*, 2013 WL 6672451, *6 (N.D. Cal. 2013) ("[I]f the PTAB cancels *all* of the asserted claims of the Asserted Patents, this action will be rendered moot. Should the PTAB cancel or narrow *any* of the asserted claims of the Asserted Patents, the scope of this litigation may be significantly simplified."). To date, the PTO has granted petitions for IPR on nine of eleven of the patents challenged in this suit, covering about three-quarters of PXG's asserted claims. A stay is more likely to simplify the issues where, as here, the PTO has already granted most of the petitions. *See generally NFC Tech. LLC v. HTC Am., Inc.*, 2015 WL 1069111, *4 (E.D. Tex. 2015) ("[A]fter the PTAB has instituted review proceedings, the parallel district court litigation ordinarily should be stayed.").

PXG contends that, even assuming the PTO eventually institutes IPR proceedings on all eleven patents, the issues would not necessarily be simplified because the standard for instituting IPR is "merely a threshold, preliminary decision." (Doc. 172 at 10.)[3] This argument is unavailing. As one court has noted:

> Although there is no guarantee that an IPR will eliminate all the claims at issue, the higher standard to initiate an IPR ("reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition" as opposed to "substantial new question of patentability") gives at least some promise that certain challenged claims will be struck down or amended if the PTO grants the petitions.

*Software Rights Archive, LLC v. Facebook, Inc.*, 2013 WL 5225522, *5 (N.D. Cal. 2013);

---

[3] When PXG filed its response, the PTO had only instituted IPR on five of the patents at issue. Accordingly, when addressing the "simplification of issues" factor, PXG argued the PTO was unlikely to institute IPR on any additional patents. This prediction turned out to be incorrect—the PTO has now instituted IPR on another four.

- 9 -

*see also PersonalWeb Techns.*, 2014 WL 116340 at *2 (the IPR's new, heightened standard of review "provides some assurance that the delay suffered as a result of IPR will be worthwhile"). In short, there is a good chance that at least some of PXG's claims will be invalidated or narrowed. Moreover, for any PXG claims that survive a written decision by the PTO, Taylor Made will be estopped from arguing in this litigation "that the claim is invalid on any ground that [Taylor Made] raised or reasonably could have raised during that inter partes review." 35 U.S.C. § 315(e)(2). Accordingly, one way or another, a stay in this case will simplify the issues for the Court.

Finally, the Court also finds it relevant that Congress's intent in creating the IPR system was to create an improved process for evaluating patent claims, by allowing subject matter experts to render binding decisions on a relatively expedited and cost-efficient basis. *PersonalWeb Techs.,* 2014 WL 116340 at *2 (citations omitted) (IPR is intended in part to "limit unnecessary and counterproductive litigation costs" and create a "cost-effective alternative to litigation"). Issuing a stay here—rather than the alternative of requiring the parties to engage is costly, parallel litigation of many of the same issues in two different forums—will best effectuate this intent. *Cf. Oil States Energy Servs.,* 138 S. Ct. at 1372 (noting potential for inefficiency and conflicting judgments in the absence of a stay); Matthew R. Frontz, *Staying Litigation Pending* Inter Partes *Review & the Effects on Patent Litigation*, 24 Fed. Circuit B.J. 469, 491 (2015) ("Congress's reasoning for implementing *inter partes* review was to present a cost-effective alternative to patent litigation. The district courts have upheld this reasoning by staying 84% of litigations pending an *inter partes* review that has been instituted."). Avoiding costly, duplicative litigation in two forums will also effectuate the overall aim of the Federal Rules of Civil Procedure—to promote the "just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1.

        c.     Prejudice

The third factor is "whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party." *Drink Tanks*, 2016 WL 3844209 at *2. "Delay

alone does not usually constitute undue prejudice"; nevertheless, courts should consider "evidence of dilatory motives or tactics" on the part of the party seeking review. *See GoPro, Inc. v. C&A Mktg., Inc.*, 2017 WL 2591268, *4 (N.D. Cal. 2017) (citation omitted). Accordingly, courts have articulated four sub-factors that are relevant to the prejudice analysis: "(1) the timing of the [IPR] request; (2) the timing of the request for stay; (3) the status of [IPR] proceedings; and (4) the relationship of the parties." *Id.* (citation omitted).

### i. Timing of IPR Requests

Taylor Made filed IPR petitions for nine of the eleven patents by April 27, 2018, less than three months after PXG served its infringement contentions. Taylor Made then filed the tenth a week after the patent at issue became eligible for IPR and the eleventh the day after the patent at issue became eligible for IPR. Petitioning for IPR mere months after PXG served its infringement contentions did not constitute a lack of diligence on Taylor Made's part. *See, e.g., GoPro,* 2017 WL 2591268 at *5 (finding reasonable diligence where moving party waited four months after receiving infringement contentions to petition for IPR); *Evolutionary Intelligence LLC*, 2013 WL 6672451 at *9 (granting stay where moving party filed IPR petition five months after service of infringement contentions). "[C]ourts have found that waiting until after receiving infringement contentions to analyze the claims alleged and then filing petitions for review does not cause undue prejudice." *Cypress Semiconductor Corp. v. GSI Tech., Inc*., 2014 WL 5021100, *4 (N.D. Cal. 2014). Moreover, "[p]rovided an accused infringer is diligent, delay due to preparing an [*inter partes* review] petition, ascertaining the plaintiff's theories of infringement, or otherwise researching the patents that have been asserted in an action does not unduly prejudice the patent owner." *Id.* (citation omitted).

### ii. Timing of Request for Stay

Taylor Made filed its stay request within two weeks of the PTO's decision to institute IPR proceedings on three patents and less than two months after the PTO's decision to institute IPR proceedings on two other patents. Before Taylor Made filed its reply concerning the stay request, the PTO instituted IPR proceedings on another four

patents. The Court thus finds that Taylor Made acted with diligence in moving for the stay.

### iii.     Status of IPR Proceedings

Nine of eleven patents, and sixty-nine of ninety-three claims, are currently in IPR proceedings. Courts are more likely to grant a stay when the PTO has already decided to grant IPR. *Compare GoPro*, 2017 WL 2591268 at *5 ("This Court has previously concluded that this sub-factor [status of proceedings] weighs against issuing a stay when the PTO has not yet decided whether to grant IPR."). This sub-factor, thus, weighs in favor granting the stay.

### iv.     Relationship of Parties

As PXG notes, "courts often find that prejudice is likely '[w]here the parties are direct competitors.'" *Drink Tanks*, 2016 WL 3844209 at *5 (citation omitted). Thus, the court in *Drink Tanks* noted that "[g]enerally, in cases of direct competition between litigants, 'courts presume that a stay will prejudice the non-movant.'" *Id.* Nevertheless, "[c]ourts are divided on whether infringement among competitors *necessarily* constitutes undue prejudice to the non-moving party." *Wonderland Nursery*, 2015 WL 1809309 at *4 (emphasis added); *see also Universal Elecs.*, 943 F. Supp. 2d at 1034 ("Other courts have declined to find prejudice even where the parties are direct competitors."). The key question is whether "monetary damages are sufficient to compensate for harm incurred during a potential stay." *Wonderland Nursery*, 2015 WL 1809309 at *4. After all, "[w]here the parties are direct competitors, a patent infringer can take market share and build brand loyalty while the case is pending, and these injuries may not be recoverable in damages or later injunctive relief." *Pentair Water Pool & Spa, Inc. v. Hayward Indus., Inc.*, 2012 WL 6608619, *2 (E.D.N.C. 2012); *see also Mike's Train House, Inc. v. Broadway Ltd. Imports, LLC*, 2011 WL 836673, *2 (D. Md. 2011) ("[I]t may sometimes be impossible to restore a patentee's original market share after years of infringement, because customers' business relationships and expectations will have changed.").

PXG contends that it directly competes with Taylor Made with respect to the products at issue in this case and, consequently, monetary damages would be insufficient

to compensate for the potential harm caused by a stay. PXG provides evidence of the direct-competitor relationship and asserts that the potential for prejudice is greater given PXG's status as a "relative newcomer to the golf club industry." (Doc. 172 at 13.) PXG also cites the declaration filed in support of its request for a temporary restraining order, in which its expert asserted that that "if Taylor Made is allowed to sell the accused products," PXG will experience at least the following types of irreparable harm: (1) "[l]oss of sales and market share/spoiled market;" (2) "[l]ost business opportunity to fully benefit from PXG's investment in the patented inventions;" and/or (3) "[l]oss of exclusivity and damage to PXG's reputation as an innovator." (Doc. 5-1 at 3-4.)

Taylor Made counters that the previous denial of PXG's request for a temporary restraining order, combined with PXG's decision to withdraw its request for a preliminary injunction, demonstrate that monetary damages would be sufficient to compensate for any potential harm resulting from a stay. Courts are divided on the significance of a plaintiff's decision not to seek a preliminary injunction in this context, but many courts have declined to hold this decision against the plaintiff. *Compare Wonderland Nursery*, 2015 WL 1809309 at *5 ("agree[ing] with Plaintiff that its decision not to seek a preliminary injunction does not conclusively establish that monetary relief is sufficient to compensate for harm suffered by the alleged infringement" and "declin[ing] to speculate as to the rationale underlying a party's tactical decisions in this litigation"), *and Mike's Train House*, 2011 WL 836673 at *2 (court's earlier holding that plaintiff failed to establish irreparable harm under the preliminary-injunction standard did not constitute a finding of adequate monetary remedy, as defendant "b[ore] the burden of showing that Plaintiff [would] not be prejudiced"), *with GoPro*, 2017 WL 2591268 at *6 ("[T]hough not dispositive, [plaintiff's] failure to seek a preliminary injunction cuts against its claim of prejudice from delay.").

Taylor Made further asserts that the relationship between the parties does not create prejudice because (1) PXG's founder has stated that PXG is a luxury brand that does not compete with other club companies and (2) Taylor Made expects to cease wholesale sales

of the allegedly infringing clubs by the time the case goes to trial, at which point money damages will become the only available remedy. (Doc. 177 at 9-11.) The Court does not find these arguments persuasive: PXG's comment was arguably taken out of context and Taylor Made's assertions about its future marketing plans are speculative. Thus, the Court finds there is a potential for undue prejudice stemming from the parties' relationship.

### v. Summary of Prejudice Sub-Factors

Based on the foregoing, the Court concludes the prejudice factor is neutral. Although the relationship between the parties creates a potential for prejudice, Taylor Made acted with diligence (both with respect to seeking IPR and with respect to seeking a stay). Moreover, the fact that IPR has been instituted on such a large portion of the patents and claims at issue cuts against a prejudice finding.

## IV. Supplemental Briefing

During the telephonic status conference on November 27, 2018, the Court asked PXG to provide supplemental briefing identifying the cases that best supported its position. In response, PXG cited *Invensys Systems, Inc. v. Emerson Electric Co.*, 2014 WL 4477393 (E.D. Tex. 2014), *Toshiba Tec Corp. v. Katun Corp.*, 2016 WL 9137646 (C.D. Cal. 2016), and *Mike's Train House, Inc. v. Broadway Ltd. Imports, LLC*, 2011 WL 836673, *2 (D. Md. 2011). (Docs. 182, 183.) In each of those cases, the court declined to grant a stay. Each of those cases is, however, distinguishable for the reasons discussed below.

In *Invensys*, the defendant was not diligent in seeking IPR, the case was in a much different posture at the time the stay request was made (the deadline for substantial discovery had already expired, a trial date had already been set, and the PTO had not yet instituted IPR on any of the patents at issue), and the case also involved several developments while the stay request was pending that are not present here (the court held *Markman* hearings and the PTO denied some of the IPR requests). *See* 2014 WL 4477393 at *2-3.

In *Toshiba*, the PTO had not instituted IPR on any patents when the stay request

was made. 2016 WL 9137646 at *2-5. Here, in contrast, Taylor Made has petitioned for IPR on all eleven of the patents at issue and the PTO has already instituted IPR on nine of them. Moreover, the court in *Toshiba* specifically found that the defendant was not diligent in petitioning for IPR or seeking a stay and voiced suspicions that the stay request had an improper tactical motive. *Id.* at *5. This Court does not have those concerns here.

Finally, *Mike's Train House* dealt with the old reexamination process, which had a longer timeline, a lower standard for granting review, and less estoppel potential. The court there was, thus, skeptical of the potential for simplification of issues and more concerned with the prejudice that would result from granting the stay. Also, as in *Invensys* and *Toshiba*, the court found the defendant lacked diligence in seeking PTO review. 2016 WL 9137646 at *4 (noting that "Defendant has offered no explanation of why it waited so long after the filing of this case to seek reexamination" and that "an 'inexplicable or unjustified' delay in requested reexamination suggests a tactical motive").

### V. Conclusion

Because the Court finds that the benefits of a stay outweigh any potential harm that could result from the stay, and in light of the "liberal policy in favor of granting motions to stay proceedings pending the outcome of PTO IPR proceedings," *Drink Tanks*, 2016 WL 3844209 at *2 (citation and internal quotation marks omitted), the Court grants Taylor Made's motion to stay.

### B. The Motion to De-Designate

During discovery, Taylor Made designated certain documents and deposition transcripts as "Confidential—For Counsel Only." PXG has moved to require Taylor Made to eliminate any confidentiality restrictions on the documents or, at a minimum, to re-designate these materials as "Confidential" so that four of PXG's key principals may review them. (Docs. 169, 178.) PXG contends the current designation is: (1) unwarranted, because the materials aren't particularly sensitive, and some of the information contained within them has already been disclosed in Taylor Made's public filings; and (2) prejudicial, because its principals need to review the documents to make informed decisions about

settlement and litigation strategy. (*Id.*) In response, Taylor Made argues the current designation is necessary to avoid the risk that PXG's principals will "use such information to Taylor Made's competitive disadvantage." (Doc. 176 at 9.)

Although the Court is sensitive to the potential for abuse that arises whenever a business is required to produce sensitive information to a competitor, Taylor Made has failed to substantiate its claim that such a potential for abuse exists here. A perusal of the documents at issue shows that the information contained within some of them isn't particularly sensitive. (*See, e.g.,* Doc. 170-1, Exh. A [email from Taylor Made employee discussing his impressions of PXG clubs during trip to driving range].) Moreover, Taylor Made took the position in its stay-related papers that PXG isn't even a true competitor. (Doc. 177 at 9-10.) It is difficult to reconcile this position with the notion that permitting four of PXG's principals to inspect the documents would result in competitive harm to Taylor Made. The Court also finds that Taylor Made's arguments concerning future harm (which are tellingly not substantiated with an affidavit) are largely based on "mights" and "ifs" about potential new strategies and designs that either company could theoretically pursue in the future. This is too slender and speculative of a reed on which to deprive PXG's principals of access to important documents in this litigation. *See Int'l Bhd. of Teamsters v. Alaska Air Grp., Inc.*, 2017 WL 6034363, *2 (W.D. Wash. 2017) (citations omitted) ("Defendants have not demonstrated that an AEO [attorney's eyes only] designation is appropriate in this case. Under [Rule 26(c)], a party seeking a protective order bears a 'heavy burden' of demonstrating that 'disclosure will cause a specific prejudice or harm' . . . [and] Defendants' claims that documents not designated AEO will be improperly disclosed or relied upon in other contexts are speculative and amount to '[b]road allegations of harm, unsubstantiated by specific examples or articulated reasoning.'"). Accordingly,

**IT IS ORDERED** that**:**

1. Taylor Made's motion to stay (Doc. 164) is **GRANTED**;

2. PXG's motion to de-designate materials (Doc. 169) is **GRANTED IN**

**PART,** such that Taylor Made must re-designate those materials as "Confidential";

3. PXG's motion for leave to amend its invalidity and infringement contentions (Doc. 134) is **DENIED WITHOUT PREJUDICE**;

4. Taylor Made's motion for leave to amend its invalidity contentions (Doc. 154) is **DENIED WITHOUT PREJUDICE**;

5. Taylor Made's unopposed motion to seal the exhibits to the de-designation motion (Doc. 176) is **GRANTED**;

6. The parties' joint request to issue letters rogatory (Doc. 163) is **DENIED WITHOUT PREJUDICE**;

7. This case is stayed until the IPR proceedings for all challenged patents in this case have concluded; and

8. The parties shall file a joint status report within **14 days** of the conclusion of IPR proceedings for all challenged patents in this case.

Dated this 29th day of November, 2018.

*Dominic W. Lanza*
United States District Judge